The next case is number 2010-1500. Eli Lilly and Company v. Actavis, Elizabeth, and others. Mr. Lipsy. Thank you, Your Honor, and may it please the Court. The judgment of invalidity below should be reversed because of three basic facts. The first is that the patent here at issue does, in fact, assert a specific practical utility, specifically the treatment of ADHD in humans. Secondly, the patent in suit does contain a written description of a specific recipe for how to treat ADHD in humans using tamoxetine, and that description was sufficiently specific that nothing remained but to actually reduce it to practice, and indeed the invention was the subject of an FDA-approved clinical trial at the time of filing. Mr. Lipsy, how do you get around Rasmussen and the 318 decision? I get around them. Which asks for proof, in effect. The law in this Court and its predecessor, dating back, at least in the cases we cited in the brief, to at least 1931, has consistently been that if an assertion of utility, the truth of the assertion is questioned, the applicant is entitled to come forward with evidence to demonstrate that the utility is, in fact, true, and that was the law in the CCPA, and there are half a dozen cases in the Federal Circuit that applied that same law, and under those circumstances, the issue is, when it's challenged, you are entitled to come forward with evidence, even evidence after the filing date, if it bears on the question of the truth of a statement that was contained in the application as filed. Are you saying that these cases, 318 and Rasmussen, were wrong, inconsistent with past precedent? What I'm suggesting is they cannot be read, and should not be read, as overruling that long-standing body of precedent, which is, in fact, embodied in decades of administrative practice in the Patent Office, because this Court's rules require that if that is to happen, the decision has to be won from the en banc court. Now, whether those decisions are wrong on their facts, it's very hard to tell, as the Court knows, reading an opinion, whether that's the case. You could look at In re 318, the Federal Circuit opinion says the trial court there found that the disclosure was non-enabling, because there was insufficient galantamine dosing information, and if that's true, then the ruling that the disclosure didn't comply with 112 was probably correct. But the analysis and reasoning, if it's read to say you're not allowed to come in with evidence and prove that what you said at the time of filing was true, that would be inconsistent with a very large body of precedent, and it should not and could not be read that way. Rasmussen actually states the law exactly the way we say it should be stated. It cites Marzocchi and cites the burden-shifting point that... Yes. Isn't there the basic argument that when the specifications said it was effective, they had no factual basis for making that, because it hadn't been established that it was effective? This is a significant point of patent law, and you've touched on the difference between a constructive reduction to practice and an actual reduction to practice. You are allowed in patent law, and this has been the law since the telephone cases, at Are we talking about reduction to practice, or are we talking about the accuracy of the adequacy of the disclosure? Suppose for the sake of argument, they said this is fully effective, and when they were challenged on it, they said, well, we think it's effective. That's not good enough to support the claim that it's effective, is it? They have to have some basis for saying it's effective, other than the fact that, based on all of our research, we hope it will be effective, and we think it will be effective, but we don't know, because we haven't tested it. Judge Lurie actually wrote an opinion touching on this point, the robotic systems case that we've cited in our brief, dealing with an analogous situation of when is an invention ready for patenting, and the Supreme Court, in fact, well said, you don't need actually to wait until you've demonstrated it, it could be ready for patenting once you have a complete conception, and Judge Lurie noted there that that doesn't mean the inventor is completely certain that it's going to work, because that usually is what is proven by an actual reduction to practice, and the patent law in the United States for more than a hundred years has been that if you are able to describe your invention with specific precision, that you demonstrate possession of the invention, in other words, evidence of a complete conception, and can describe how to do it in a manner that enables people to practice it without undue experimentation, then you are entitled to claim that invention, even though you haven't actually done it, and Alexander Graham Bell hadn't done it on his most valuable embodiment either. Were the dosages approved by the FDA within the ranges set out in the patent? Almost spot on, your honor. The patent says that the dose should be from 5 to 100, the approved doses in the FDA are from 10 to 100. But what about one of these opinions of ours that says a good guess isn't enough? I'm paraphrasing. I think that's Rasmussen, if I recall correctly. Yeah, it probably is Rasmussen. And to be honest, to phrase the question that way is to assume the answer. What we have here, we had an extensive body of knowledge about this molecule that was studied for more than a decade at Lilly, the pharmacology in animals, the toxicity in animals, it was tested in humans extensively, in fact it was the realization in these very large scale tests that actually failed to show antidepressant activity that it was really very, very safe, was part of the motivation for suggesting using it in ADHD where other molecules were not safe. There was an extensive body of experience, there was a detailed description of how to use it, it was the subject of an FDA approved clinical trial, this wasn't a shot in the dark, it had been approved by the MGH IRB, it had been approved by the FDA, the ethical constraints that apply when you go to treat people, this was not a phase 1 study, it was a phase 2 study in actual patients. When you go to treat patients with a drug, there must be some expectation of clinical benefit. All of those indicate here that what we have in this patent application is not a guess. Now if one wants to phrase the question as, well can you get a patent on a guess, while that's kind of a loaded question, the fair answer is, if by whatever way the inventor has come to a realization that a certain collection of instrumentalities used in a particular way, which he describes with specificity in his patent application, to attain a result, and it in fact does so and it's true, there's no provision in the United States patent law that suggests he should not be entitled to the patent, and indeed the consequence of denying him that patent would simply be to deprive the public of the benefit of a useful invention that happened to have been made. You would say if the guess is wrong, the patent is just worthless, which is hardly the case here with all these ANDA applicants. That's correct. Yeah, I mean, indeed there's a body of authority that when you're dealing with an issue patent and a presumption of validity, that when it comes time to write the opinion and the trial court finds infringement of otherwise valid claims, that there's really no room left to argue that the invention does not have validity. Yeah, but still, you've got this language in 318. The end of the day, if the specification does no more than state a hypothesis and propose testing to determine the accuracy of that hypothesis, that is not sufficient. That's a wall you've got to climb. It is indeed, and I submit it's a semantic wall. It is as a matter of science. A hypothesis is a proposition that is susceptible of definitive experimental proof. That's what a hypothesis is. Every time you have a constructive reduction to practice, you could call it a hypothesis. The inventor says, if you do these things, it will work this way. It is susceptible of proof. That proof is the actual reduction to practice. You're saying if there's no actual reduction to practice and one files a constructive reduction to practice, and you've got a non-obvious invention, the whole system makes no sense. That sufficiates the significance of a constructive reduction to practice. Is that your point? No, not at all. I have in my hand the patent from the Adams battery case, 2322210. It's shorter than our patent. It's written entirely in the present tense. There's not a scrap of data in it. One month after he filed this, he went to the Department of the Navy, and the story goes according to the Supreme Court, they told him they didn't think it worked. At the Supreme Court, that was not an indication that this was not a perfectly patentable invention. It was an indication. It was, in fact, non-obvious and very patentable, and indeed, the operability, as I understand the law, was demonstrated at the podium in the court. Which you are not doing. I don't have to, because the FDA has already approved this method, the very method described with the doses I described as safe and effective, the MGH clinical trial, the data was available five months after the application was filed. Had the patent office made any challenge to the utility, we could have responded, as this vast body of authority dictates, by showing them the MGH data, and this issue would not be here, and we respectfully submit we should not be in a worse position, because the patent office accepted our assertion of utility, than we would have been had we been challenged and come forward with that evidence. Just one quick last point, I realize I'm in my rebuttal. There's no need to engraft upon the utility requirement of 101 some special requirements that aren't there in order to prevent the abuses that are described in the appellee's briefs. There are other provisions of the patent statute that protect against that. The written description requirement ensures that the inventor, in fact, is in possession of the invention at the time he files. The enablement requirement ensures there is, in fact, real and immediate public benefit. The tools we've talked about, this vast body of precedent, that's the tool a patent office uses to weed out improper assertions of utility, and it's been that way, that's been the way it's been done for at least 100 years, and this terrible flood that they're concerned about has simply not come to pass. Just yesterday, the court handed down Research Corp v. Microsoft, dealing with 101, admittedly the other part of it, but pointed out the impropriety there of trying to substitute the requirements of 101 for the other substantive provisions of patentability, namely, obviousness and enabling disclosure in the written description. I will reserve the rest of my time for rebuttal. Thank you, Mr. Woodson. Mr. Murkowski? Thank you, Judge. May it please the Court, William Murkowski, arguing for the defendants. Lily's position, basically, is they can assert and identify any utility they want in the application, regardless of whether the skilled person has it at the filing date, which is critical. No, they didn't say that. They said they could assert and identify this utility. They said they could identify a utility in their application, and that it doesn't matter whether the skilled person would believe that utility as of the filing date. Well, let's deal with this case and the utility that they asserted. Absolutely, Your Honor. And as Judge Friedman said, we need to look at the adequacy of the disclosure. Because this Court has said in cases like Rasmussen and 318, typically, human therapeutic methods are supported, the utility is supported, with either data or results, but you don't have to have that. Typically, it is. And the NPEP says typically it is. We could also have something else, a convincing rationale of some type, so that after the filing date- Some would boil the plate, but plausible, particularly in light of the facts here, concerning enablement. And it turns out to be correct. Why does one need a rationale? I make an invention. I disclose it. If I'm wrong, it's worthless, the patent's worthless, but if I'm right, the public gets the benefit of it. You need a rationale, Your Honor, to establish a credible utility as of the filing. Otherwise, you're sanctioning the patenting of guesses or hypotheses. And now Lilly wants to say, or they're impliedly suggesting these cases were wrongly decided, but we can go back to Brenner and the Supreme Court, and we know that you can't patent guesses. They're the Supreme Court- Are you telling us that this assertion of utility is incredible? At the time of filing, it was incredible, Your Honor, and we know that in this record. It's actually undisputed. Lilly's expert testified, and the district court credited, that as of the time this application was filed, in 1995, January 1995, the skilled person would not have believed this invention could work, because in his view, it was based on a wrong theory, the wrong model that was untenable, and it had been put to rest by 1995. It seems to me what your position basically comes down to is that they should not have applied for this patent until they had gotten the results of the tests. Not necessarily, Your Honor. Why not? Actually- How else could they have met your standards? You are correct, Your Honor. They did jump the gun. They could have filed when they had actual data or test results showing, in fact, evidence such that the skilled person would believe that this would work as of the filing date. They indisputably did not have that in January of 1995, but that's not the only way they could do it. In your view, what should they have done in this case to have a valid application? They either had to have some data or results, or some other convincing rationale such that it's a 318- Well, what data could they have had without waiting for the results of the tests? Your Honor, there was all kinds of rationales and data they could have used. There was actually human clinical data out there on dicipramine and tamoxetine. There was data showing that a selective norepinephrine reuptake inhibitor like dicipramine worked very effectively to treat ADHD. There was also data and evidence in the art showing, linking that therapeutic efficacy to its activity as a selective norepinephrine reuptake inhibitor. They also had animal data, and a lot of it, showing that tamoxetine was an even better and more potent and selective inhibitor. So they could have drawn, easily tried to draw a rationale and a link to convince the skilled person that this would work, but they chose to do nothing, and they put nothing in their disclosure. And again, I think it's key to focus on, what did they disclose? We have a patent- Are you saying it's necessary to put in the patent application all of the knowledge that's out in the scientific literature, or that might be known to a person experienced in this field, in order to meet your requirement? They do not have to put everything known into their specification, Your Honor.  Well, I was just giving an example of a rationale that they could have used to illuminate a credible utility, Your Honor. Whether they use that specific rationale or not, they have to put something in there so the skilled person would believe that it could work. Because if you don't, we run right into the Brenner problem. What the Brenner court saw was, you have to establish that utility as of today, your filing date. The court said, we're not blind to the fact that tomorrow, maybe you will be able to establish that credible utility. Brenner was quite different. Brenner talked about a process for making steroids of no known utility. Here is a statement of one compound as having a particular utility. That's not Brenner. A particular utility, Your Honor, that the expert, Louie's own expert, testified no one would believe. And in fact, even if you inject hindsight into the analysis, he testified that the skilled person, even with the specification in hand, as of the filing date, would not have believed this would work. But did the Patent Office question it? The Patent Office did not question it, Your Honor, but we know that that doesn't make the difference here. We know that from 318. And if we want to look at what happens in the Patent Office, we can look to Rasmussen. We can look what happens in a case like this when you file an application with no data and no convincing rationale as to why the skilled person should believe it would work. And Rasmussen, he filed on the compound finasteride to treat prostate cancer. The Patent Office called him on it and said no one would believe that that would work. Rasmussen then had later published and acquired data showing actual human clinical efficacy. And this court said that evidence was dated too late to establish the requisite credible utility as of the filing date. And in fact, Your Honor, cases from Brenner all the way forward to Rasmussen, 318, and you can establish utility in fact later, after the filing date. We had the ultimate utility in fact in Rasmussen, 318. But if the data after the filing date shows the correctness, the accuracy of the disclosure at time of filing, what's wrong with that? Well, we know, Your Honor, from Because often enough the examiner may challenge something and then you go in the lab and you get the data. That's post-filing data. You're right. You're correct, Your Honor. That's acceptable. But that later established utility in fact, which is what we had in Rasmussen. We had an FDA-approved compound, what we had in 318, an FDA-approved compound, and raloxifen in the recent Teva case, FDA-approved. The ultimate utility in fact, all established after the fact. But those cases wouldn't have existed if that answered the question here. The courts didn't say utility in fact was later established. That's good enough. No, each court put that aside and said, focused on the disclosure as of the filing date and said, what do we have in here? Does this disclosure, as the 318 court said in the dissent or the majority, either illuminate a credible utility as of the filing date or lead the skilled person to believe and accept without question that that compound could work as claimed as of the filing date? Is it a fair question to say that what's involved here is the specification says three times that this would be effective. Padnos doesn't challenge it. And is the question really, what more, if anything, did they have to say in their specification in order to provide an effective disclosure? And that's actually a good point, Your Honor, because that's something this court does not have to decide the quality and quantum of evidence that had to be in the specification to decide this case. This isn't even like 318, where in that case the court admittedly had no data or test results. But at least that court was put in the position of deciding, what about the inventor's so-called novel insights and rationality put into the specification? And in that case, the court said, we're not aware of any human therapeutic treatment method that his utility established as of the filing date based solely on analytical reason. But we're going to give you the benefit of the doubt. And we're going to look at it to see, was that enough? And then they eventually concluded it wasn't enough. And even if it was, they had a problem because it wasn't actually disclosed in the specification. Here, we don't have that problem. This is a case of an old drug that is being used to treat a different disease. Is that right? Absolutely, Judge. We have an old compound off patent. Also, this is a strange case in that apparently animals don't have this condition. So they couldn't really test this drug to see if it is effective by administering it to mice or rabbits or any other animal. But the district court didn't require that, Your Honor. And that's an important distinction. That's what's involved here. And the question is, what does the inventor have to say in explaining why he believed that this old drug would be effective in dealing with this condition? Well, that's the key here, Your Honor, because this patent doesn't say anything. No data or rationale. At least in 318, the inventor there, she attempted to put in a convincing rationale. And that's the key. If you don't want to have data or experimental proof, that's fine. Don't put it in there. Although they did have data they could have put in this application. But if you're going to leave that out, Rasmussen tells us, 318 tells us, even Brenner suggests to us, that you'd better put something else in there to convince the skilled person that it would work without question. And this court doesn't have to decide what that has to be here, because this specification had nothing. It literally has no data, no rationale, no thinking. But you're saying there must be some proof in a disclosure. Not necessarily proof. It could be a convincing rationale, as Rasmussen said. If you don't want experimental proof, as in Rasmussen, he didn't have any. But many times, the proof of rationale comes after, sometimes long after, the actual knowledge of utility. Sometimes utility, in fact, yes, comes after the filing date. And again, as we saw in Rasmussen, 318, and Lilly v. Teva, obviously, FDA approval came years later, where we had the ultimate utility, in fact. But what Rasmussen teaches us, 318 teaches us, is that if you don't want to have that proof, you better have something in there so that the skilled person would accept without question it would work. Because if you don't, then what you're doing is you are opening the floodgates to patenting mere guesses, mere hypotheses. And Your Honor mentioned a plausible utility, one of your prior questions, to this specification. That's what's key here. And actually, what makes this case even worse than Rasmussen, Brenner, and 318. As it turned out, it was certainly plausible. As it turns out, Your Honor, they filed on a hunch, and it worked out. But that's not what Brenner allows. You have to establish that from the get-go so the skilled person would believe it. Now, in the 318 case, for example, even though the court didn't accept that rationale there, at least she attempted to put one in that the patentee's expert said was scientifically grounded. In Rasmussen, the court said, well, at least you're attempting to put something that is plausible. But in both cases, the court said, scientifically grounded is not enough. Mere plausibility is not enough to establish a credible utility as of the filing. Because if it were, again, you could file on an unproven hypothesis. And that's exactly. I always thought it was the other way around. If the skilled person doesn't believe it, all the more creative the concept. You're talking about the criteria of obviousness. If the skilled person would believe it and have expected it, then it would not be patentable under 103. Well, when you're talking about obviousness, Your Honor, clearly, things like skepticism can play a part. But it's not correct to say that the more outrageous the invention is, the less you have to prove. This was an invention that worked. If it's outrageous to the skilled person who doesn't believe it, all the more creative the concept. You're saying only ordinary inventions that any ordinary person could have foreseen and made are entitled to enter into the patent system? No. What we're saying, Your Honor, is you can't file on a mere proposal or a guess or, as the Brenner Court said, an object of serious scientific investigation. You have to establish that credible utility as of the filing date, which plays a critical purpose so that you don't patent guesses and, as the Court said, turn this into a hunting license. You have to have a definite, firm, and currently available utility. We didn't have that here. The inventor didn't think this invention would work when it was filed. He called it a mere hypothesis, an area of interest. Well, that's what scientists do. You have hypotheses until you proceed with your experimental verification. Hypothesis can be, nonetheless, creativity and be the concept of an invention. But you have to disclose that. You have to have an adequate disclosure, Your Honor. And the more unpredictable the field or the more confused the art, the more you have to put in your specification for enablement and utility, not less. That's the point here. When we're talking about utility, and I think, again, it's important to note that this is not a situation with a specification that gives you some type of roadmap, rationale, or thinking as to why this would work, in which case the obviousness, utility-slash-enablement standards, maybe there could be conflation because when you use hindsight with that document in hand as of the filing date, you could see the inventor's thinking and how it's distinguishable from the prior art. But that's not what we have here, Your Honor. It's a blank slate. It gives no thinking or rationale as to why this would work. The only thing that could support this patent is the prior art. And we know from the district court's fact findings that Lilly doesn't challenge on appeal, that in fact, the skilled person, even with the patent in hand, would not have believed this could work. And that's the requirement. I assume in your analysis, if before the patent issued, Lilly had submitted to the patent office the results, the successful results of the test, that wouldn't save it. That would not save it. Under your theory, because you looked at it only as of the date of filing. Is that right? Absolutely, Your Honor. But that's not our theory. That's the answer we know from Rasmussen, from Brenner, and from 318. Because if that were correct, if Lilly is reading this decades of present correct, then all those cases would have been wrong. Rasmussen, 318, even Eli Lilly versus Teva. If you could use later established utility and fact to solve the question, then Rasmussen should have gotten his early filing date. But he didn't. This court said, your evidence was dated 2-8. You don't get to file an application with no rationale whatsoever for credible utility and then come in later after the fact and retroactively enable it with evidence, a disclosure that was clearly insufficient as filed. And that's the key difference here.  I think we have the argument. Thank you, Mr. Rasmussen. Thank you, Judge. Thank you. Mr. Lipsey. I'll be brief. Judge Friedman hit the nail right on the head that there is no animal model of this disease. And actual proof, actual reduction to practice, the only way to do it was with an actual human test. And that test was the subject of an FDA-approved clinical trial at the time. Well, that gives a reason. I'm sorry? That gives a reason why you didn't have animal data, that that doesn't answer the question of the legal need for a credible utility. And that is my next point. The statute, while it requires an assertion of a specific and practical utility, and therein lay the fault in Brenner, as the Court noted, Brenner did not assert a practical utility for the products of those processes at all. And there was going to need to be research to figure out what, if any, utility there was. Here we have an assertion of a practical utility. And the law there, as it's been since at least 1974 in the Langer case, which should have cited and didn't, which is the extension of Marzocchi to the utility issue. Well, is the real question, when you assert something without giving any backup proof, whether the assertion at least is a credible one? In other words, if I assert that I have discovered that aspirin will cure permanently all back pain type, and that's all I say, I suppose the answer is, well, that's not a credible assertion, because everybody knows that simple aspirin is not enough to permanently cure all back pains. And the way that would be handled, if such an assertion were made in a patent application, that would be a practical utility, if true. Brenner would be satisfied. Would that be enough if I just said that? No. What would happen is the patent examiner would have a legitimate basis through documents and even sound scientific reasoning to say, Judge Friedman, I don't think that's going to work as broadly as you say. And the law in this court, since at least 1931, is the burden would then be on you to come forward with evidence sufficiently satisfactory to prove to the examiner that the asserted utility was not credible, that the asserted utility was true. And that's exactly what the Langer case says. Suitable proofs indicating that the statement of utility and its scope as found in the specification are true. There is no requirement in the patent law that the assertion be viewed as credible by people of ordinary skill in the art with nothing more than the patent application in their hands. So it all turns on whether the patent office or the patent examiner raises a question about it. That's the mechanism that's in place to protect the public from the horrors that they have alleged. If the issue were to arise in litigation, conceivably, at that point in time, if there was a sound basis for questioning the utility, the burden might well be shifted, although the burden of persuasion never shifts on the issue of validity, but it may be appropriate to come forward with additional evidence that, in fact, the statement of utility is, in fact, true. Including after acquired data? Including absolutely after acquired data. We've cited at least a half a dozen cases from this court and its predecessor where that was abundantly clear. That after acquired data, it's not used to make a disclosure that was non-enabling. Enabling, it's used to prove that a disclosure that was an enabling as filed, that the statements in it are true. The patent law requires certain things to be true. The patent law requires certain things to be in the application. One of the things that must be true... True or not false? In the world I live in, I deal with what's true, but to the extent that I'm the patentee and the burden is on them, I assume the issue is not false. It has to be proven not true at the moment by clear and convincing evidence. If I could just briefly touch on... You have one last word. I'm sorry? Yes, you have one last word. Yeah, on Rasmussen, the fact pattern in Rasmussen is very complicated. It's a patent interference. There's no presumption of validity. If you actually look at the opinion of the board that was being reviewed, it's paper number 122 in the patent office there. On page 29 there, they outline the arguments Rasmussen made in response to that enablement motion. He contended he didn't have to have data and that a person skilled in the art would accept what he had in there as credible. That's all he argued. For whatever reason, he did not come in with a demonstration that what he had described in his patent application was, in fact, operative as described. He just didn't do it. And that's all Rasmussen stands for. Thank you very much for your patience. Thank you, Mr. Lipsy and Mr. Riccosi. The case is taken under submission.